Wanamaker, J.
We have in this case almost every variety of legal and. constitutional question. Indeed, the record and briefs are so voluminous in the treatment of the issues raised that it will be *218 impossible, outside of a volume, to note and discuss them all. Those meriting serious attention will be noted below.
I. The question as to the jurisdiction of the court of appeals to entertain the proceedings in error from the court of common pleas.
This court has already held in Snyder et al. v. Deeds et al., 91 Ohio St., 407, decided in December, 1914, that “the portion of the sixth section of said [conservancy] act which provides for appeal from an order refusing to establish such district to the court of appeals of said county, upon giving bond as provided therein, is void because repugnant to Section 6, Article IV, of the Constitution.” It is now claimed that by reason of such holding as to “appeal” there is no authority of law, either by statute or constitution, conferring jurisdiction “in error” upon the court of appeals. This court has repeatedly held that proceedings in error are fairly and reasonably included in the term “appellate-jurisdiction,” and it will be therefore necessary to examine the constitution with reference to the appellate jurisdiction conferred therein upon the court of appeals.
Section 6, Article IV of the Constitution of 1912, contains the following language as to the jurisdiction of the courts of appeals:
“The courts of appeals shall have original jurisdiction in quo warranto, mandamus, habeas corpus, prohibition and procedendo, and appellate jurisdiction in the trial of chancery cases, and, to review, *219 affirm, modify or reverse the judgments of the courts of common pleas, superior courts and other courts of record within the district as may be provided by law.”
That this proceeding in error was to reverse a judgment of the court of common pleas, there can be no doubt. The mere fact that it was constituted of more than one common pleas judge does not alter the fact that it was to all intents and purposes a court of common pleas. The only question to be determined here is whether or not there was any provision “by law” for this proceeding in error.
It seems to be agreed upon both sides that whatever authority has been provided “by law” is by virtue of Section 12247, General Code (103 O. L., 431), which reads as follows:
“A judgment rendered or final order made by a court of common pleas or by the superior court of Cincinnati, or by a judge of either of such courts, may be reversed, vacated or modified, by the court of appeals having jurisdiction in the county wherein the common pleas or superior court is located, for errors appearing on the record.”
A statute undertaking to provide a rule of practice, a course of procedure or a method of review, is in its very nature and essence a remedial statute. It should not be narrowly and technically construed but upon the contrary should receive a broad and liberal construction to effect the purposes of its enactment. The language of the foregoing statute is as broad and comprehensive as language can well be made and clearly covers all judgments, *220 whether predicated on an ordinary civil action, chancery case, special proceeding under a statute or any other judgment for which no special review provision is made by the statute itself.
But it is claimed that in the conservancy act special provision was made by way of “appeal,” and that the appeal having failed, proceedings in error must now fail. True it is that where special provision is made by the statute for appeal or review, and such special provision is conformable to the constitution, such special provision must be followed as against general provisions, but where those special provisions fail because they fail to conform to the constitution, as they have failed in this case, the general provision, if it be sufficiently comprehensive, will then prevail. The court of appeals rightly and lawfully exercised jurisdiction in this cause under said section of the statute and pursuant to the constitution.
II. This conservancy act, as a whole, is challenged as null and void for sundry and divers reasons which may be grouped under two heads:

First. That it failed to have the constitutional majority required for the valid enactment of an emergency law.

Second. That the act is in conflict with various provisions of the constitution of Ohio and the constitution of the United States.

First. No claim is made that at any stage of the passage of this act it failed to receive a majority *221 vote of each branch of the general assembly, sufficient to make it an ordinary law under the old constitution. But it is urged very strenuously that in order to make said act an emergency act, as provided by the constitution, it must clearly and affirmatively appear that the act as a whole received a two-thirds vote upon final passage in both branches of the general assembly and that the special emergency section must also receive a two-thirds majority in each branch of the assembly; that the records in this case unquestionably show that in the house vote upon the concurrence in the senate amendments the bill received only a mere majority vote, and that, therefore, said bill failed as an emergency measure. Evidently the sole purpose of the constitutional requirement of a two-thirds majority in emergency measures was for the purpose of withdrawing such measures from the referendum provisions of the constitution.
It being conceded that this act had a majority vote in both houses and that no attempt was made to invoke the referendum provisions of the constitution thereon, then at the end of the niriety-day period the same became a valid law as enacted. The time within which a referendum might be invoked, as provided by the constitution, had elapsed. The right to have the same referred to the people for judgment had been lost and it was too late thereafter to attack the emergency character of that act, either as to the vote thereon, or otherwise.
Manifestly the legislature’s judgment in that behalf, as shown by the act itself aiid the records touching the same, is not conclusive. The people’s *222 right to a referendum on any act of the legislature may be asserted, in a proper proceeding and at a proper time, notwithstanding the action of the general assembly of Ohio, but it is too late after the expiration of the referendum period provided by the constitution.
Second. Constitutional objections inherent in the act. It is especially urged that the conservancy act takes private property without due process of law; denies the equal protection of the laws; delegates legislative power to the courts; permits the jurisdiction of courts of common pleas to be fixed by the petitions of citizens; that the power of taxation is delegated to directors, in violation of Section 1, Article II of the Constitution; that political subdivisions are created to be governed by directors appointed by the court and not elected by the people; violates various home-rule provisions of the state constitution, and sundry other objections which, so far as they are deemed important, will be noted in the opinion.
Both state and federal courts are uniform in their holding that before a legislative act can be declared unconstitutional, it must be clearly in conflict with some provision of the constitution. It will not do to hold that the act is unconstitutional because it is contrary to a general spirit pervading the constitution, but the conflict must be between the act and some specific provision, either in express words or by clear implication.
Of late many of the courts, and especially the federal courts, have held that the conflict must be *223 “beyond a reasonable doubt,” and all the courts throughout the states and Union hold that where there is a reasonable doubt as to whether or not there is such conflict that doubt must be resolved in favor of the statute and its validity therefore upheld.
In order then that the conservancy statute, or any part thereof, shall be held unconstitutional it must appear that the statute permits something which the constitution prohibits or prohibits something which the constitution permits, and that this conflict must be so clear that it is beyond reasonable doubt.
In construing a constitution we apply the same general rules that we do in statutes, save and except that the terms of a constitution must of necessity be of a more general and omnibus character, and, therefore, in order that the grants of power under the constitution shall be workable, such grants should be favorably and liberally construed so as to effect the public welfare sought by the constitutional grant.
What is permitted by this statute that is prohibited by the constitution, or what is prohibited by the statute that is permitted by the constitution ?
Police power has always been recognized as one of the sovereign attributes of government. It is generally defined as “that inherent sovereignty which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such *224 economic conditions as an advancing civilization of a highly complex character requires.” 8 Cyc., 863.
The subject of drainage, in order to serve the public health, convenience and welfare, has always been regarded as a legitimate exercise of the police power of government. This power has always been peculiarly recognized as a legislative power, inherent in the lawmaking body, even though there be no express constitutional authority therefor.
An early case, refreshing and illuminating upon • this doctrine generally, is that of Reeves v. Treasurer of Wood County et al., 8 Ohio St., 333, in which a most able opinion is rendered by Judge Brinkerhoff.
But the people of Ohio especially delegated the police powers involved in this case to the legislature, in the following language of the Constitution of Ohio, as found in Article II, Section 36, the part applying reading as follows:
“Laws may also be passed * * * to provide for the conservation of the natural resources of the state, including streams, lakes, submerged and swamp lands and the development and regulation of water power and the formation of drainage and conservation districts.”
This amendment was adopted September 3, 1912, and reads almost like a prophecy of Jeremiah as to the terrible floods that visited different portions of the state in March of the following year.
Whether the legislature proceeded under the general police power vested in government or under the special provision of the constitution, or both, is unimportant. Suffice it to say that it did *225 proceed, to enact a conservancy statute, as found in volume 104 O. L., 13 et seq., which is entitled:
“An act to prevent floods, to protect cities, villages, farms and highways from inundation, and to authorize the organization of drainage and conservation districts.”
It is contended with much vigor and plausibility that the statute is in clear conflict with- the 5th and 14th Amendments of the Federal Constitution, especially that part that denies to any state the right to deprive any person of “life, liberty, or property, without due process of law,” or to deny to any person the “equal protection of the laws.”
The “due process” clause has been much abused and stretched to limits never designed by the constitution-makers. But it must be observed that it -is not the deprivation of property that is prohibited by this amendment, but the deprivation of property •¿without due process of law. Full provision is made at every stage of the conservancy act, from the time of the filing of the petition to create a conservancy district until the last step is taken, for the assertion of any and all rights by any and all parties affected by this act. Every person substantially affected is given a “day in court” from the time of the organization of the district until the proposed improvement is completed. To illustrate:
The petition must set forth —
“First: The proposed name of said district.
“Second: The necessity for the proposed work and that it will be conducive to the public health, safety, convenience or welfare.
*226 “Third: A general description of the purpose of the contemplated improvement, and of the territory to be included in the proposed district. * * * Said territory need not be contiguous, provided it be so situated that the public health, safety, convenience or welfare will be promoted by the organization as a single district of the territory described.
“Fourth: Said petition shall pray for the organization of the district by the name proposed.”
In addition to provision as to the petitioners and all parties of record, special provision is made by Section 6 of the act that “Any owner of real'property in said proposed district who individually may not have signed such a petition and who wishes to object to the organization and incorporation of said district shall, on or before the date set for the cause to be heard, file his objections why such district should not be organized and incorporated,” etc.
The conservancy act providing what the petition must contain, it follows that upon the hearing the court must find the allegations of the petition to be true; that is, “The necessity for the proposed work and that it will be conducive to the public health, safety, convenience or welfare.”
Throughout the entire act ample provision is made for any objector to appear, whether he is a party to the record or not, either before the court at the time of organization, or before the board of directors after the organization, or the board of appraisers, and present his objections, either as to his being within the district, as provided by Section 29, which he may do after the district is created, or as to the amount of assessment upon his lands, or *227 as to any other right that he may believe to have been violated, and have the same heard and determined.
In this view of the case it is difficult to seriously point out where and how there has not been accorded to the private citizen, as well as to the public, every substantial consideration of his rights as recognized by the phrase “due process of law.”.
But it is claimed that he is denied the “equal protection of the laws.” Written constitutions were adopted not as a sword against the public interests, but as a shield to protect the public interests, safeguarding the rights of the humblest citizen as well as the highest, but all the while recognizing that even private property is subservient to the general welfare.
If the “equal protection of the laws” must be determined with mathematical nicety and precision, no public improvement, local, state or national, would be possible. Especially would this be true in drainage improvements and projects. One cannot read this law, however, without being impressed with the fact that the legislature had in mind all the while that the improvement should be constructed and the cost thereof paid with reference to the burdens and benefits of the improvement.
The mischief and burden legislated against was the surplus waterfall. The creation of a conservancy district by the court of common pleas would certainly raise the presumption that all lands included within the district would be benefited, and that the burden and benefit should receive due consideration in the apportionment of the cost of the *228 improvement, whether relating to the preliminary plans, cost of construction or the expense of maintenance.
The court in the establishment of the district might well conclude that in the ordinary and natural course of events an acre of land within the watershed but twenty miles from the improvement would probably cast as big a burden of rainfall as an acre of land immediately adjoining the improvement, and that taking care of this surplus water, acre for acre throughout the district, would be'of substantially equal benefit to the real property of that district.
As evidence that the act contemplates assessments according to benefits, Section 12 requires the directors to prepare a plan for the improvement for which the district was created, and that such plans, data, etc., shall set forth properly “the location and character of the work, and of the property benefited or taken or damaged,” etc.
Again, in Section 27, it is provided that the board of appraisers shall “proceed to appraise the benefits of every kind to all real property within or without the district, which will result from the organization of said district and the execution of the official plan.”
And, again in the same section, “The board of appraisers shall also appraise the benefits and damages, if any, accruing to cities, villages, counties, townships and other public corporations,” etc.
Again, in Section 28, as to lands affected outside of the district, reference is again made to appraising the benefits and damages to such land.
*229 Section 29 and other sections of the act are to the same general effect.
Indeed it is quite evident that an unusual opportunity was taken to express the plan of assessments based on benefits and burdens.
Now the language of the act uses the word “tax,” but the word “tax” is a general term and is used frequently as a general tax, or as a local and special tax, in which latter instance it is more frequently spoken of as an “assessment.” Indeed, it has been repeatedly held that the word “tax” is sufficiently general and comprehensive to include the word “assessment.” The very fact that personal property is excluded from bearing the cost of the improvement and that the word “property” is held to mean by the terms of the act to be real property, forces us to the conclusion that it was the intention of the legislature to provide for the cost of the improvement by way of assessment, as in other drainage cases.
Courts will not limit themselves to the form and name of things. It is their duty to probe deep enough to get at the substance and the essence of the thing by whatever name or brand it may be known. The whole spirit of the law and its provisions in connection with its practical operation unmistakably indicate that the legislature used this word “tax” in its local and special sense. In short, as an assessment.
Section 43 of the act provides that “As soon as any district shall have been organized under this act, and a board of directors shall have been appointed and qualified, such board of directors shall *230 have the power and authority to levy upon the property of the district not to exceed three-tenths of a mill on the assessed valuation thereof as a level rate to be used for the purpose of paying expenses of organization, for surveys and plans, and for other incidental expenses which may be necessary up to the time money is received from the sale of bonds or otherwise.”
We have carefully read and examined the contention in the voluminous briefs that this is a general tax levy, and that, therefore, it violates numerous provisions of the constitution .as to the laying and levying of general taxes. The court of appeals in a very able opinion adopted this view of the case.
Having, however, already found that this is a special and local tax in the nature of an assessment, we approve the reasoning found in the federal case of County of Mobile v. Kimball, 102 U. S., 691. In that case the state of Alabama had provided for the improvement of Mobile harbor and had provided for the payment by a levy upon the property of the county of Mobile. Objection was taken that this was either a local improvement for the city of Mobile alone or else it was a state improvement. In either event the county of Mobile should not be taxed for the cost of the improvement.
Mr. Justice Field, on page 703, uses this language:
“Here the objection urged is that it fastens upon one county the expense of an improvement for the benefit of the whole state. Assuming this to be so, *231 it is not an objection which destroys its validity. When.any public work is authorized, it rests with the legislature, unless restrained by constitutional provisions, to determine in what manner the means to defray its cost shall be raised. It may apportion .the burden ratably among all the counties, or other particular subdivisions of the state, or lay the greater share of the whole upon that county or portion of the state specially and immediately benefited by the expenditure.”
But a case more in point, indeed on practically all fours with the case at bar, is the recent case of Houck v. Little River Drainage District, 248 Mo., 373 (affirmed, 239 U. S., 254). In the Missouri case, as in the case at bar, a corporation was created for the purpose of reclaiming or improving swamp or overflowed lands. The corporation was vested with power and authority to construct and maintain whatever works were necessary to accomplish the object and to raise the funds to pay for the same by assessment on the lands to be benefited thereby.
The Missouri statute contained this provision:
“As soon as any drainage district shall have been organized under order of the circuit court, and a board of supervisors are elected and qualified, such board of supervisors shall have the power and authority to levy upon each acre of land in the district, not to exceed twenty-five cents per acre, as a level rate, to be used for purpose of paying expenses of organization, for topographical and other surveys, for plans of drainage, for ex *232 penses of assessing benefits,” etc., “before entering upon the main work of drainage.”
The supreme court of Missouri held that that section was constitutional as against the contention of “due process of law” and “equal protection of the laws” provided by the federal constitution. They also found that it was no violation of the Missouri- constitution, which, so far as the matters are involved, is not unlike the constitution of Ohio. This Missouri case is rich in its reason, and apparently covers the whole doctrine of police power exercisable by the state in its relation to the creation of districts for drainage or conservation purposes.
Special attention is here noted to the language of the supreme court of Missouri touching this statute. The court say, touching the flat rate of twenty-five cents per acre upon all lands within the district for preliminary survey, plans of drainage, etc., before entering upon the main work of drainage:
“The section is constitutional. If it be objected that no judicial finding of benefits is required, it will be answered that the Legislature has seen fit to entrust to the judicial department the establishment and territorial limitation of the benefit district in a proceeding in which the question whether or not each tract included will be benefited is directly involved. Having expressed its will as to the principles which should govern the distribution of these taxes upon the land so found to be benefited the Legislature has left the necessary amount of the assessments to be ascertained by the authorities *233 of the district, as it leaves like questions of municipal taxation to its municipal agencies.”
Again, the court further says-in its syllabus:
“Again, if it be objected that it might be developed by the work, and therefore it must be assumed to have been contemplated by the law, that there will be no resulting increment, which, under the name of benefits, constitutes the only constitutional support for this class of taxation, it will be answered that, when the organization of a drainage district has reached the stage where the tax in question may be levied, the situation is: The Legislature has designed an important public work and has found that its accomplishment will result in such benefit to the lands included in its scope as to justify the assessment of the entire cost as a special tax against them. The power to tax necessarily includes the power to raise the money in such time and manner as is necessary to accomplish the purpose for which the tax is levied.”
The common pleas court having found in this cause that the allegations of the petition are true and having therefore organized the drainage district, it must be presumed that the lands included within such district are benefited so as to justify the assessment as to preliminary plans, surveys, etc., by a flat rate of three-tenths of a mill upon all lands included within such district. No question is seriously made as to the actual cost of any plan hereafter adopted or the expense of its maintenance. The validity of the three-tenths mill levy for preliminary expense is the only question seriously made.' We do not believe that such levy, made *234 under the exercise of the sovereign police power of the state, violates any provision of state or federal constitution.
Again, it is claimed with much force that the conservancy statute undertakes to delegate legislative power. It is not specifically pointed out just what powers are strictly and wholly legislative, but it certainly cannot be seriously contended that the powers vested in the court of common pleas pertaining to the creation of the district are in any strict sense legislative powers.
A hearing is involved, a trial upon certain issues made by the petition and the objections thereto, and certain findings must be made by the court of common pleas in that behalf, all of which are essentially judicial in their nature. But it is claimed that the appointment of the directors and appraisers and their functions are legislative in character and amount to a delegation of legislative power.
It is difficult to see how this is any more a delegation of legislative power than the appointment of receivers and the various orders of court authorizing them to continue a going concern or to sell the same and distribute the proceeds, or to appoint appraisers in any given case, or any of the numerous boards that have heretofore been appointed by courts for the purpose of carrying out the substantial provisions of various statutory proceedings. But suppose that the powers so conferred are g«£m-legislative, it must be conceded they are also gwowi-administrative and quasi-judicial, and in such cases where the twilight zone of distinction prevails it has always been regarded as the right *235 and duty of the legislature to determine the nature of the function exercised and the body that should exercise it.
In this case they have conferred that power upon the court of common pleas. Whether that was wise or not is not important in this case. That should have been addressed to the legislative body that enacted the law.
We are satisfied that there is no constitutional prohibition against it.
Innumerable instances are available in our jurisprudence with reference to public improvements, such as turnpike roads, ditches and the like, where the. legislature has delegated to township trustees, county commissioners or other bodies, authority to lay out and organize districts for the construction of such improvement and for taxing or assessing the lands benefited thereby, and such enactments have been almost uniformly held valid; that is, that they were not a delegation of legislative power as prohibited by the constitution.
Manifestly the legislature itself could not do the work contemplated by this statute. It would be impracticable. The only other alternative would be that the improvement must fail, that the general welfare must suffer because nobody but the legislature could exercise the power.
We find in this act no violation of the constitution in this respect.
Again, it is urged that the conservancy act violates the home-rule provisions of-the constitution.
Suffice it to say that the home-rule provisions of the constitution apply to municipalities, townships, *236 counties and the like and like political subdivisions that existed before we had states and constitutions. The doctrine in nowise applies to the creation of drainage or conservation districts, where the power to be exercised is peculiarly a state power, the sovereign police power. It has always been recognized as peculiarly the function of the states.
The statute provides for the organization of a district that may include any number of municipalities, townships and counties. How then could it be said that any one of these should be vested with the power to administer the law beyond its own jurisdiction and that would be necessary under its home-rule right? It is inconceivable. The home-rule doctrine, so far as it is applicable, is itself conserved by permitting the officers of the district to administer the affairs of the district in the organization thereof, the construction of the improvement and the maintenance thereof.
Many other objections are noted in the numerous briefs, but in the main they are not germane to a judicial inquiry. They should have been addressed to the legislature at the time the statute was pending. This court has nothing to do with the wisdom or unwisdom of the policy involved in the statute. Its duty is ended when it determines the questions as to whether or not any federal or state constitutional provision has been violated, and whether or not the proceedings under the statute have been regular and are agreeable thereto. So far, what has been said has had special reference to what has become known as the “Dayton Conservancy Dis *237 trict,” and the judgment of the court of appeals is therefore affirmed.

Judgment affirmed.

The second case, No. 14829, The State, ex rel. Robert P. Duncan, Prosecuting Attorney, v. The Franklin County Conservancy District, was a proceeding in quo warranto instituted in this court, in which substantially the same questions as in No. 14834, the Dayton case, were raised by a demurrer to the amended petition.
The demurrer to the amended petition in that case will therefore be sustained.

Demurrer sustained. '

Nichols, C. J., Donahue and Newman, JJ., concur.
Johnson, Jones and Matthias, JJ., dissent from paragraph 4 of the syllabus.